**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JERRID DOUGLAS, ROY JOHANNES GILLAR, and HAROLD MIGNOTT,**<br><br>**Defendants.** | **Criminal Action No.: 17-0544 (ES)**<br><br>**OPINION** |

**SALAS, DISTRICT JUDGE**

Before the Court is Defendant Jerrid Douglas's motion for bail pending appeal pursuant to 18 U.S.C. § 3143(b). (D.E. No. 727 ("Motion"); *see also* D.E. No. 727-1 ("Mov. Br.") & D.E. No. 736 ("Reply")). The Government opposes Douglas's Motion. (D.E. No. 735 ("Opp.")). The Court decides this matter without oral argument. *See* L. Civ. R. 78(b); L. Crim. R. 1.1. For the reasons set forth below, Douglas's Motion is **DENIED**.

## I. BACKGROUND

The instant motion stems from Douglas's October 21, 2022 conviction, along with two co-defendants Roy Gillar and Harold Mignott, of: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (all Defendants); (2) four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 & 2 (all Defendants); and (3) transacting in criminal proceeds, in violation of 18 U.S.C. §§ 1957 & 2 (Defendants Douglas and Gillar). (D.E. No. 632; D.E. No. 260 ("Second Superseding Indictment" or "SSI")). Douglas and his co-defendants were convicted after a five-week jury trial

before the Honorable John Michael Vazquez, retired United States District Judge. (Mov. Br. at 1; Opp. at 1[1]).

Douglas, along with his co-defendants, was indicted for conspiracy to commit wire fraud, wire fraud, and transacting in criminal proceeds by a Grand Jury on December 18, 2017. (D.E. No. 66).[2] Douglas was accused of conspiring with Gillar, Mignott, and an individual named James Adkins[3] to defraud a group of victims—including Douglas's alleged "best friend" Janus Holder and Holder's associate Raj Patel—out of $800,000. (SSI at 4; Mov. Br. at 6). More specifically, Defendants were accused of, beginning in early 2016, representing themselves as principals of a shell company, "GMB," and, over the course of several months, fraudulently inducing Holder and Patel to enter a "joint venture agreement with GMB to pay GMB approximately $800,000 . . . by, among other things, falsely representing" that Defendants could obtain for Holder and Patel a Standby Letter of Credit ("SBLC").[4] (SSI at 4). Holder and Patel "needed access to an SBLC in order to consummate business deals for their business venture to buy raw gold in Africa and sell it to refineries in Dubai." (*Id.* at 5). Douglas allegedly falsely told the victims that he "had access to an SBLC through defendant [Gillar's] company, ['All Bloom'], in the amount of €1,000,000,000 (one billion euros), collateralized by Mexican gold-backed bonds valued at approximately $21 billion owned by GMB." (*Id.*).

[1] Unless otherwise noted, pin cites to Docket Entry Number 735 ("Opp.") refer to pagination automatically generated by the Court's electronic filing system.

[2] A Superseding Indictment was submitted on April 16, 2018 (D.E. No. 108), with a Second Superseding Indictment on October 10, 2019 (SSI).

[3] Adkins was indicted as well, but he died before trial. (Mov. Br. at 4 n.1).

[4] An SBLC is defined in the Second Superseding Indictment as "a guarantee of payment issued by a bank on behalf of a client that is used as a 'payment of last resort' should the client fail to fulfill a contractual commitment with a third party." (SSI at 3).

After Holder and Patel transmitted $800,000 to an escrow account pursuant to the deal, Douglas and Adkins allegedly told them that an SBLC had been obtained, and began pressuring them to authorize the release of the money to "Gillar Worldwide," a company purportedly owned by Gillar. (*Id.* at 2 & 7). When Holder and Patel wanted verification of the SBLC, Douglas allegedly showed them "a 2012 Record of Safekeeping from a bank, which purported to show that the bank was holding or storing Mexican gold-backed bonds for GMB or its affiliates" instead. (*Id.* at 7). Defendants allegedly told Holder and Patel that the $800,000 "would be refundable if GMB did not provide the SBLC," leading them to release the money out of escrow to Defendants. (*Id.* at 8). Defendants were also accused of "falsely stat[ing] that they had ordered the SBLC from the International Bank and that they would provide [a Ready, Willing, and Able Letter ('RWA')][5] from the International Bank as proof that the SBLC would be issued," and providing "a fraudulent RWA on letterhead from the International Bank stating that the International Bank was ready, willing, and able to provide a €1,000,000,000 (one billion euro) SBLC to GMB." (*Id.*).

The Second Superseding Indictment alleged that "contrary to their fraudulent representations," after Holder and Patel transmitted the money, "neither GMB nor the Defendants provided [the victims] with an SBLC or anything else of value. Instead, the Defendants misappropriated [the victims'] money for their personal use on items like luxury cars, luxury watches, leasing and mortgage payments on their personal residences, and large cash withdrawals." (*Id.* at 4).

At trial, Douglas's defense was that "he acted in good faith and believed that an SBLC would actually be issued—in short, he had no knowledge that an SBLC would not be produced,

[5] The Second Superseding Indictment defines an RWA as "a bank-issued document on a client's behalf that verifies a bank or financial institution is ready, willing, and able to proceed on behalf of a client in any number of various financial transactions." (*Id.* at 3).

and he had no intent to defraud." (Mov. Br. at 1). After Douglas was convicted, he moved for acquittal under Federal Rule of Criminal Procedure 29 due to insufficiency of the evidence, as well as, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33 based on court rulings which allegedly deprived him of his constitutional right to present a defense. (D.E. No. 661). Judge Vazquez denied the motions on June 16, 2023. (D.E. No. 699). On July 26, 2024, Douglas was sentenced to 45 months' imprisonment. (D.E. No. 724 at 42). Douglas filed a notice of appeal regarding his conviction and sentence on August 1, 2023. (D.E. No. 721). That appeal is still pending before the Third Circuit.

On October 26, 2023, Douglas filed the instant motion seeking bail pending the determination of his appeal pursuant to 18 U.S.C. § 3143(b). (Motion). Douglas argues that evidentiary rulings made by Judge Vazquez—including excluding several pieces of evidence and denying Douglas's request to recall a witness to the stand—were in error, and that said error is likely to result in reversal on appeal. (*Id.*). For the following reasons, the Court denies Douglas's motion.

## II. LEGAL STANDARDS

Congress enacted the Bail Reform Act of 1984 to create a presumption in favor of post-conviction detention. *United States v. Miller*, 753 F.2d 19, 22–24 (3d Cir. 1985); 18 U.S.C. § 3143(b). Pursuant to 18 U.S.C. § 3143(b)(1):

> [T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for writ of certiorari, be detained, unless the judicial officer finds—
>
> > (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community . . . and

> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
>
> > (i) reversal,
> >
> > (ii) an order for a new trial,
> >
> > (iii) a sentence that does not include a term of imprisonment, or
> >
> > (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1). Accordingly, for bail pending appeal to be appropriate, the defendant must establish:

> (1) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released; (2) that the appeal is not for purpose of delay; (3) that the appeal raises a substantial question of law or fact; and (4) that if that substantial question is determined favorably to the defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

*Miller*, 753 F.2d at 24.[6]

Under the third prong's substantial-question analysis, "a court must determine that the question raised on appeal is a 'substantial' one, i.e., it must find that the significant question at issue is one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." *Miller*, 753 F.2d at 23. To that end, a defendant "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *United States v. Smith*, 793 F.2d 85, 89 (3d Cir. 1986) (citation omitted) (cleaned up). Because a defendant

---

[6] Following *Miller*, amendments were made to § 3143(b)(1)(B) to include the language set forth in (iii) and (iv) regarding potential change in sentence. *See United States v. Malik*, No. 08-0614, 2010 WL 276323, at *2 n.2 (E.D. Pa. Jan. 21, 2010). Those amendments are not relevant to this case.

must demonstrate that the appeal (and not the initial issue before the district court) raises a substantial question of law or fact, the district court must look to the applicable appellate standard of review when assessing the third prong. *See, e.g.*, *United States v. Jafari*, No. 12-0475, 2015 WL 4744375, at *4 (D.N.J. Aug. 10, 2015) (considering whether defendant's *Batson* challenge on appeal presents a substantial issue of law or fact in the context of a clear-error standard of review); *United States v. Onyenso*, No. 12-0602, 2015 WL 3761889, at *3 (D.N.J. June 16, 2015) (considering whether defendant's evidentiary challenges on appeal present substantial questions of law or fact in the context of an abuse-of-discretion standard of review).

If the question raised on appeal is substantial, the court next "must determine whether that issue is sufficiently important to the merits that a contrary appellate ruling is likely to require reversal or a new trial." *Miller*, 753 F.2d at 23. This does not mean that the district court must believe that its own decision is likely to be reversed. *Id.* Rather, the "language must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal." *Id.* Indeed, "[a] question of law or fact may be substantial but may, nonetheless, in the circumstances of a particular case, be considered harmless, to have no prejudicial effect, or to have been insufficiently preserved." *Id.* Reversal is "likely" if "the question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Id.*

## III. DISCUSSION

The Court proceeds directly to the third and fourth prongs of the analysis because there is nothing before the Court to suggest—and the Government does not argue—that (1) Douglas poses either a risk of flight or a danger to the community or (2) Douglas brought this motion merely for

purposes of delay. *See United States v. Hamilton*, No. 05-876, 2010 WL 3024864, at *2 (D.N.J. July 28, 2010) (proceeding directly to third and fourth prongs of analysis).

Douglas argues that Judge Vazquez made several errors during his trial which constitute substantial questions and which would likely lead to reversal if determined in Douglas's favor by the Third Circuit. Namely, Douglas alleges that Judge Vazquez "excluded over a dozen key documents that were admissible and critical to Douglas's defense and ruled that Douglas could not call [a witness, Holder,] in his defense case to enable him to introduce a key document." (Mov. Br. at 21). More specifically, Douglas alleges that Judge Vazquez improperly: (i) excluded evidence related to Douglas's belief regarding the valuation of GMB's assets and its supposed Mexican gold bonds, and refused to allow Douglas to recall a witness, Holder, in order to introduce that evidence; (ii) excluded emails from Gillar to Douglas stating that the transaction was progressing and that Holder and Patel's funds would be returned to them; and (iii) excluded evidence showing that Gillar, Adkins, and Mignott sent information to Douglas indicating that the SBLC would be issued long after the initial money transfer occurred. (Mov. Br. at 21–28). Douglas argues that these pieces of evidence would have bolstered his good faith defense by (i) demonstrating that he had a good faith basis to believe that GMB's alleged $21 billion valuation based upon Mexican gold bonds was not a misrepresentation, and that "he had actually conveyed to Holder information showing that GMB's purported assets of $21 billion were specifically tied to the value of a single asset, the bonds, and the value was in dispute";[7] and (ii) demonstrating that Douglas did not know the transaction was a fraud, and that Douglas was incapable of refunding the victims himself, by showing that his co-defendants sent Douglas false reassurances about the transaction and the possibility of refunding Holder and Patel. (*Id.*). Douglas further argues that

[7] This is important, Douglas argues, because it demonstrates that Douglas did not lie to Holder regarding the value of GMB's assets. (Mov. Br. at 23–24).

these pieces of evidence were excluded based on misinterpretations of the Federal Rules of Evidence, including that "documents could only be admitted if a witness with firsthand knowledge of their contents testified," and that Douglas could not recall Holder to testify about a particular document because he had made a strategic decision not to question him about that document when Holder was originally on the stand. (Mov. Br. at 7 & 17–18).

The Government responds that Judge Vazquez did not err in excluding the evidence in question because none of the precluded documents were relevant, and it was within Judge Vazquez's discretion to prevent Douglas from recalling Holder to ask about a document that he could have questioned him about the first time he took the stand. (Opp. at 12–15). Thus, the Government argues, Douglas's appeal does not present a substantial question. (*Id.*). Even if Judge Vazquez did commit error, the Government argues, any error was harmless due to the overwhelming evidence against Douglas. (*Id.* at 15–16).

The Court concludes that, even presuming the questions presented by Douglas are substantial, Douglas has not demonstrated that if the Third Circuit agreed with Douglas's claims of error, that decision would be "likely to result in reversal or an order for a new trial." *Miller*, 753 F.2d at 24.

The appellate standard for reversal/a new trial applicable to constitutional, as well as non-constitutional, trial court errors is harmless error. *United States v. Molt*, 615 F.2d 141, 145 (3d Cir. 1980) (citing *Chapman v. California*, 386 U.S. 18, 22 (1967)). In general, "[e]rrors in evidentiary rulings will not be reversed when 'it is highly probable that the error did not affect the result.'" *United States v. Evdokimow*, 726 F. App'x 889, 896 (3d Cir. 2018) (quoting *United States v. DeMuro*, 677 F.3d 550, 557 (3d Cir. 2012)). "'High probability' requires that the court have a 'sure conviction that the error did not prejudice the defendant,' but need not disprove every

'reasonable possibility' of prejudice." *United States v. Grayson*, 795 F.2d 278, 290 (3d Cir. 1986) (quoting *United States v. Jannotti*, 729 F.2d 213, 219–20 & n.2 (3d Cir. 1984)). "When the error found is of a constitutional nature, a court may nonetheless uphold the conviction if the error was 'harmless beyond a reasonable doubt.'" *United States v. Korey*, 472 F.3d 89, 96 (3d Cir. 2007) (citation omitted). When evidence supporting conviction is "overwhelming," courts find errors—constitutional or not—to be harmless. *See Evdokimow*, 726 F. App'x at 896 ("[W]e will not reverse when the other evidence in the record of the defendant's guilt is overwhelming."); *United States v. Christie*, 624 F.3d 558, 571 (3d Cir. 2010) (finding evidentiary error harmless "given the truly overwhelming quantity of legitimate evidence against" the defendant); *United States v. Joseph*, 178 F. App'x 162, 167 (3d Cir. 2006) ("Even assuming that the error here was constitutional, in light of the overwhelming evidence supporting [the defendant's] conviction, we conclude the error was harmless beyond a reasonable doubt.").

As Judge Vazquez noted in determining Douglas's motions for acquittal or a new trial, the evidence against Douglas and in support of the Government's case is overwhelming (D.E. No. 712 at 13), and thus Douglas has not demonstrated that, even if the Third Circuit were to agree with his claims of error, that determination would result in a new trial or reversal of his conviction. *United States v. Kevra-Shiner*, No. 14-0257, 2017 U.S. Dist. LEXIS 163593, at *24 (M.D. Pa. Sept. 28, 2017) ("The court finds that this issue does not present a substantial question of law and fact that is likely to result in a new trial for the defendant based on the totality of the government's evidence presented at trial which overwhelming[ly] established the defendant's guilt."). The evidence indicating Douglas's participation in the scheme and lack of good faith includes, but is not limited to:

- Douglas was in a dire financial situation, with nearly empty bank accounts and past-due bills (such as mortgage bills and his children's school tuition bills), demonstrating motive (D.E. No. 639, Trial Tr. Vol. III, at 607 & 612);

- Douglas's proposal of obtaining an SBLC worth a billion euros was unrealistic in nature (D.E. No. 646, Trial Tr. Vol. X at 2046);

- Douglas falsely boasted about having completed oil deals worth hundreds of millions of dollars and having experience obtaining SBLCs, in order to represent himself as credible to the victims (D.E. No. 641, Trial Tr. Vol. V, at 1042; Trial Tr. Vol. X at 2045);

- Douglas held himself out as the CFO of GMB and another company, Brilliant Petroleum Company ("BPC"), which in actuality were shell corporations with no demonstrable employees or tax payments (Trial Tr. Vol. X at 1925–26 & 1954–55; D.E. No. 647, Trial Tr. Vol. XI, at 2243–44);

- Douglas pressured the victims to move quickly despite no demonstrated need to do so for such transactions, and provided them unnecessary and false deadlines (D.E. No. 638, Trial Tr. Vol. II, at 286–88; GX-125g; GX-125i);

- Douglas agreed in the Joint Venture Agreement with Holder and Patel to provide prompt verification of the SBLC after Holder and Patel transferred the $800,000 into escrow, but this did not occur (Trial. Tr. Vol. II at 366);

- Douglas continued to insist to Holder and Patel that the deal was legitimate despite the failure to provide prompt verification of the SBLC, and pressured them to move the money out of escrow so that he and his co-defendants could have access to it; in the process of doing so, Douglas showed the victims pictures of Mexican gold bonds supposedly held by GMB and backing the SBLC rather than actual proof of the SBLC, and threatened the loss of the deal if they did not act fast, despite no evidence that the deal—if legitimate—would have such a time limit (Trial Tr. Vol. X at 2075–79);

- Douglas's representations that Mexican gold bonds backed the SBLC contradicted his earlier representations that cash backed the SBLC (GX-125d; GX-615a);

- Douglas remained in frequent communication with his co-defendants throughout the whole process (GX-1201–1204; GX-1206);

- When the money was released from escrow, the agent transferred $44,750 to a bank account controlled by Douglas (GX-1200);

- After Holder and Patel released the money to Defendants from escrow, Douglas still failed to provide verification of the SBLC, and on a call with Holder, Patel, and Adkins, stayed silent while Adkins claimed multiple times that the SBLC had been ordered (GX-100);

- Douglas later participated in another conference call with Holder, Patel, and his co-defendants, during which Gillar and Adkins refused to give Holder and Patel proof about where their money had gone and lied repeatedly to Holder and Patel about their money and the SBLC, including that they would supply a "Ready, Willing, and Able" letter ("RWA") to Holder and Patel to verify the SBLC's existence; Douglas himself told Holder and Patel to verify the SBLC through a clearinghouse called Euroclear—which, evidence at trial showed, was not possible (GX-101; Trial Tr. Vol. V at 886–87 & 898);

- Instead of following up on and investigating concerns held by Holder and Patel about Gillar's background, Douglas attempted to blindly allay those concerns by sending them a dubious letter of reference for Gillar (D.E. No. 639, Trial Tr. Vol. III, at 455–61);

- Douglas sent Holder and Patel a falsified RWA letter from HSBC Bank supposedly confirming the SBLC and stating (falsely) that Gillar and his company had 1 billion in euros in an HSBC account; even the victims testified that the letter was obviously fake on its face due to, among other things, mistakes in the logo and misspellings (GX-161; Trial Tr. Vol. III at 498 & 503; Trial Tr. Vol. I at 115–16; D.E. No. 640, Trial Tr. Vol. IV, at 711–12; Trial Tr. Vol. VI at 1108–09; Trial Tr. Vol. X at 2094);

- Similar fake bank documents were found on the Defendants' computers and in their emails to each other (Trial Tr. Vol. I at 115–16; Trial Tr. Vol. V at 842–44 & 887–89; Trial Tr. Vol. X at 1896–98);

- Despite being an experienced banker, Douglas messaged Holder that he would send instructions on how he could verify the SBLC through Euroclear, which, as stated, was impossible; when Douglas sent the instructions, they were strange, long (11 steps), and confusing; a testifying Euroclear employee stated that had never seen anything like the instructions before (GX-125k; GX-950; GX-950a; Trial Tr. Vol. III at 491–95; Trial Tr. Vol. V at 904–09; Trial Tr. Vol. X at 1976–77);

- Douglas did not take up or respond to the offer of one of Holder and Patel's associates to call Euroclear directly with Douglas, or respond at all to the associate's requests for more information about the relevant bank officers to the transaction (Trial Tr. Vol. X at 1988–91); and

- On the day Holder told Douglas he would like to speak to Douglas—and later told Douglas that he was going to report him to the FBI—Douglas deleted numerous fake banking documents related to the transaction that were on his cellphone, evidencing consciousness of guilt. (GX-125N; GX-1208; Trial Tr. Vol. III at 544–45).

In the face of this mountain of evidence, the minor circumstantial evidence of good faith Douglas wanted to introduce could not have moved the needle. Douglas's alleged good faith belief in the value and validity of the gold bonds purportedly held by GMB—and his alleged conveyance of the disputed nature of the gold bonds to Holder—does not speak to or counteract the majority of the overwhelming evidence against Douglas presented at trial. And Douglas concedes that he was able to present other evidence of his good faith belief in the value of the gold bonds at trial—namely, a letter purportedly from the Mexican government discussing the value of the bonds. (Mov. Br. at 23). Further, while Douglas appears to consider evidence that his co-defendants sent him false information about the progression of the transaction to be strong evidence of his own innocence and good faith, those messages could conversely be viewed as Douglas's co-defendants providing him false information that he could convey on to Holder and Patel, as the front man of the operation. Such evidence is circumstantial at best, and is dwarfed by the other evidence presented at trial. The evidence being overwhelming, the Third Circuit is not likely to reverse Douglas's conviction or order a new trial on his stated grounds for error. *See Kevra-Shiner*, 2017 U.S. Dist. LEXIS 163593 at *24. Douglas therefore cannot satisfy the fourth factor of § 3143(b)(1), and "because [Douglas] cannot satisfy all four factors under § 3143(b)(1), the Court must deny his Motion." *United States v. Horvath*, No. 15-0400, 2017 WL 4074282, at *4 (D.N.J. Sept. 13, 2017).

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for bail pending appeal is **DENIED.** An appropriate Order follows.

Dated: January 17, 2024

Esther Salas, U.S.D.J.