**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*970 Broad Street, 7th floor*
*Newark, New Jersey 07102*

*973-645-2700*

**FILED UNDER SEAL & *EX PARTE***

March 17, 2025

Hon. Esther Salas, U.S.D.J.
U.S. District Court
Martin Luther King Jr. Federal Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

Re: *United States v. Jerrid Douglas et al.*
Crim. No. 17-544 (ES)

Dear Judge Salas:

The Government is writing to provide information that the prosecution team in this case recently learned concerning a witness, Gaurav Srivastava ("Srivastava"), who testified at trial in the fall of 2022 before Judge John Michael Vazquez (now retired). At the outset of trial, the Government wrote to the Court about Srivastava in a letter submitted *ex parte* and under seal, dated September 29, 2022 (the "Letter," attached as Exhibit A). Specifically, pursuant to the Letter, the Government sought and received the Court's permission not to disclose to the defense sensitive information about Srivastava's work as an FBI confidential informant ("CI") on issues of national security. The Letter remains under seal. This letter is also being filed under seal and *ex parte* because it discusses the Letter.

The prosecution team—comprised of the undersigned Assistant U.S. Attorney and the FBI Special Agent assigned to this case (the "Case Agent")—has just recently discovered that its Letter contained several serious inaccuracies pertaining to the scope of Srivastava's work as a CI and derogatory information about his trustworthiness. Accordingly, as discussed below, the Government seeks the Court's permission to: (1) unseal the Letter so that the Government may disclose it to the defendants; and (2) unseal this letter to allow the Government to disclose the information contained in it to the defendants.

### A. The Letter, the Trial, and Srivastava's Testimony

***The Letter:*** Before Srivastava testified at trial, the Government submitted the Letter to disclose to the Court that "[u]nrelated to this case, from September 2019 to December 2021, Srivastava was a [CI] for the FBI and provided information concerning national security and counterterrorism matters." Exh. A (9/29/22 Letter) at 1. The Letter also stated that "Srivastava was paid $7,244.08 by the FBI for his work as a CI: $500 for 'services,' and the remainder for reimbursement of expenses like food and travel." *Id.* The Government sought the Court's permission to "withhold information about Srivastava's work as a national security and counterterrorism CI from the defense" based on the following:

> Because of its sensitive nature, the Assistant U.S. Attorneys on this case do not know even the general nature of the information provided by Srivastava, let alone specific information he furnished. However, an FBI agent with knowledge of Srivastava's activities as a CI confirmed that there is no information in Srivastava's CI file, nor anything about his work as a CI, that might call into question Srivastava's credibility. The agent also confirmed that Srivastava stopped working as a CI for strictly administrative reasons. Accordingly, the Government respectfully requests that the Court order that the Government can withhold information about Srivastava's work as a national security and counterterrorism CI from the defense here.

*Id.* at 1-2. Judge Vazquez granted the Government's request, *see* ECF No. 607 (*sealed*), and the information contained in the Letter remained under seal and was never disclosed to the defense.

As indicated in the Letter, the prosecution team did not have access to Srivastava's CI files. Instead, the prosecution obtained all of the information contained in the Letter from an FBI Special Agent in Los Angeles who had knowledge of Srivastava's CI activities (the "Handling Agent"). Specifically, on or about September 20 and 28, 2022, the prosecution team spoke by phone with the Handling Agent, who provided the factual information memorialized in the Letter. On that call, I read all the relevant portions of the Letter back to the Handling Agent, who confirmed that the information was accurate based on the Handling Agent's knowledge and review of Srivastava's CI file.

***The trial:***[1] At trial, the Government alleged that the defendants Jerrid Douglas, Roy Gillar, and Harold Mignott, along with their co-conspirator James

---

[1] The following factual summary derives from the facts set forth in the Government's opposition to the defendants' post-trial motions and the U.S. Probation

Adkins (who passed away before trial), conspired to scam victims out of $800,000 by consistently and continually lying to the victims to trick them into paying money for a financial product that did not exist. One of the victims was Janus Holder, who had been close friends with Douglas. The other main victim was Raj Patel. Holder and Patel had been trying to start a gold business overseas, and they realized that they needed a specific financial product—a Standby Letter of Credit, or SBLC—to effectively launch the business. Because Douglas had prior finance experience, Holder and Patel sought Douglas's help to obtain an SBLC. Douglas falsely told the victims that he could obtain an SBLC for them valued at 1 billion euros.

Douglas and his co-defendants then proceeded to lie—either affirmatively or by omission—dozens of times about information vital to the victims. Among other things, they lied about: the existence of the SBLC; the funds backing the SBLC; how the victims could confirm the SBLC; that the SBLC cost $1 million; that the defendants were legitimate businessmen involved with lucrative businesses called GMB and BPC; that the defendants were putting up $250,000 from GMB to fund the SBLC; and that the defendants fake businesses were real and had substantial assets. Those lies worked. The victims sent $800,000 to the defendants through an escrow agent, and, once the defendants got their hands on that money, they split it among themselves and spent it on luxury items and personal expenses.

After the defendants stole the victims' money, they tried to cover it up in myriad ways, which included sending the victims a bogus HSBC bank document and fake instructions about confirming the SBLC on a system called Euroclear. Meanwhile, the defendants had already divvied up the victims' money and had begun spending it on themselves. The defendants did not spend any of those funds on a real SBLC or a financial instrument of any kind. Nor did they return the money to the victims. The defendants carried out the scam by consistently and continually lying to the victims to trick them into paying money for a financial product that did not exist.

Based on this and other evidence, the jury deliberated for only 90 minutes and returned a unanimous verdict of guilty against all defendants on each count of the Second Superseding Indictment: wire fraud conspiracy, substantive wire fraud, and transacting in illicit proceeds.

***Srivastava's trial testimony:*** Srivastava was not a victim of the charged crimes. Rather, he was one of two witnesses who the Court permitted the Government to call at trial to testify about past acts involving one or more of the defendants. To that end, Srivastava testified, in substance, as follows:

- In 2015, he founded a company in California focused on cancer detection.

Office's Presentence Investigation Report ("PSR"). *See* ECF No. 673 at 2-17; PSR at ¶¶ 44-77. In turn, it is based on facts established at trial.

- Seeking additional investment for his company, Srivastava met Douglas through a mutual acquaintance, and in early 2016, Douglas told him that Douglas and Adkins could provide financing through their company, GMB.
- Douglas and Adkins said that GMB possessed $21 billion worth of bonds, which could collateralize a loan.
- Douglas, Adkins, and Mignott all participated on a call with Srivastava.
- Douglas said he and Adkins could provide Srivastava with a $100 million SBLC in exchange for a $1 million fee.
- Srivastava signed a contract with Douglas and Adkins in early April 2016 in which he agreed to pay $1 million in exchange for $100 million in financing.
- Shortly after signing the term sheet, Douglas and Adkins began to pressure Srivastava to transfer the $1 million, and threatened to sue him if he did not.
- Afraid of being sued, Srivastava transferred $250,000 to Douglas and Adkins through the escrow agent in late April 2016.
- In late May 2016, Adkins sent Srivastava a letter demanding that Srivastava transfer an additional $750,000 to escrow to complete the upfront fee and threatening to sue him if he did not comply. Srivastava never did so.
- Neither Adkins nor Douglas ever provided Srivastava with an SBLC or anything of value, nor did they ever refund his money.

Srivastava's testimony was corroborated by, among other things:

- Substantial text messages between Douglas, Srivastava, and others, which were extracted from Douglas's cell phone;
- A fake ABN ABMRO bank document found on the defendants' devices;
- A slide deck containing false information about GMB and BPC;
- A "Letter of Intent" that Douglas and Adkins sent Srivastava, which, among other things, claimed that GMB had access to an extremely high-valued SBLC from either Standard Charted Bank or HSBC bank;
- A term sheet that Douglas and Adkins sent Srivastava that again referenced, among other things, a high-value SBLC from either Standard Charted bank or HSBC that Srivastava could access if he sent a $1 million upfront fee to the escrow agent to access that SBLC; and
- An "Escrow Release Letter" that Srivastava signed, which authorized releasing $250,000 (a quarter of the $1 million upfront fee) from the escrow agent to the defendants. (This was the $250,000 that the defendants falsely told the victims had come from GMB to help fund an SBLC.)

During the Government's lengthy summation, *see* Trial Tr. 3047–3148, the Government relied sparingly on Srivastava's testimony, *see id.* at 3080, 3133–3135. The Government argued that the jury "doesn't have to like" Srivastava, and that his testimony should be used for the "very limited purpose" of showing that:

- The $250,000 that the defendants told the victims came from GMB actually came from Srivastava;
- Srivastava's interaction with Douglas, Adkins, and Mignott was additional evidence of the co-coconspirators' relationship with each other; and
- Because Douglas had promised Srivastava access to an SBLC that never materialized, Douglas was on notice that there was no SBLC.

### B. <u>Post-Trial Motions, Sentencing, and Direct Appeals</u>

Post-trial, the defendants moved under Rules 29 and 33 for a judgment of acquittal or a new trial. ECF Nos. 658, 659, 661. After considering lengthy briefing from all parties, the Court denied the defendants' motions on June 16, 2023. ECF No. 699.

On June 22, 2023, the Court sentenced Gillar to 72 months' imprisonment and Mignott to 36 months' imprisonment. ECF Nos. 700-706. On July 31, 2023, the Court sentenced Douglas to 45 months' imprisonment. ECF Nos. 717, 718, 720. Gillar filed a notice of appeal with the Third Circuit on June 30, 2023, ECF No. 707, Mignott filed a notice of appeal on July 5, 2023, ECF No. 708, and Douglas filed a notice of appeal on August 1, 2023, ECF No. 721.

On October 26, 2023, Douglas filed a motion seeking bail pending appeal, ECF No. 727, which the Court denied on January 11, 2024, ECF No. 738-739.

On September 5, 2024, Gillar filed a motion seeking to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(2), in light of the new Zero Point Offender guideline set forth in Part B of Amendment 821 to the U.S. Sentencing Guidelines. ECF No. 782. The Government opposed that motion, ECF No. 753, which remains pending.

The defendants' appeals of their respective convictions and sentences are pending in the Third Circuit. 3d Cir. Dkt. No. 23-2205 (Gillar) ("G. App. Dkt."); 3d Cir. Dkt. No. 23-2223 (Mignott) ("M. App. Dkt."); 3d Cir. Dkt. No. 23-2391 (Douglas) ("D. App. Dkt."). Douglas and Gillar each perfected their direct appeals by filing briefs on December 3, 2024. G App. Dkt. 37; D App. Dkt. 45. Mignott has not yet perfected his appeal.

The defendants' deadline to file Rule 33 motions for a new trial based on newly discovered evidence expires on October 21, 2025. Fed. R. Crim. P. 33(b)(1).

### C. <u>August 2024 – Wall Street Journal Article</u>

On August 27, 2024, the Wall Street Journal published an article titled: *Fake Spy, Russian Oil and $1 Million Funneled to Democrats: Former business partner claims Gaurav Srivastava scammed millions by posing as a CIA operative* (attached

as Exhibit B). The article alleged, among other things, that Srivastava may have defrauded a foreign businessman out of millions of dollars by falsely claiming that he was connected to the CIA. *See id.*

After the Article was published, Douglas' defense counsel promptly emailed it to the Government seeking confirmation that the person referenced in the article was the same person who testified at trial. The Government provided that confirmation and has told counsel that we are further investigating the matter to obtain additional information.

**D. <u>Newly Obtained Information about Srivastava</u>**

Before seeing the Article, the prosecution team had no knowledge of the fraud alleged in the Article. Nor did the prosecution team have any knowledge of Srivastava's work with or for any Government agencies beyond the FBI, or beyond the information contained in the Letter.

Over the past several months, the prosecution team has endeavored to obtain as much additional information as possible. This has included recently obtaining access to Srivastava's lengthy FBI source file, which had been accessible only to the FBI's Los Angeles field office from in or around August 2020 until in or around mid-December 2024.

The below timeline reflects additional information that the prosecution team has learned as part of these efforts (the dates listed below are approximate).

<u>September 20, 2019</u>: An FBI Special Agent from the field office in Tampa, Florida opened Srivastava as a CI on national security related issues, and Srivastava began working actively as a CI.

<u>October 16, 2019</u>: The FBI generated a report showing that Srivastava was reimbursed $5,550.00 for travel expenses, and was paid $500 for "services." This is generally consistent with the information in the Letter pertaining to the amount of money Srivastava received from the FBI. *See* Letter at 1.

<u>August 3, 2020</u>: The FBI closed Srivastava because he was then living in London, England, and it was difficult to coordinate with him during the COVID-19 pandemic. At the time he was closed in August 2020, there does not appear to have been any derogatory information about Srivastava reported in his CI file.

<u>August 11, 2021</u>: The FBI's Los Angeles office received a complaint accusing Srivastava and others of committing investment and securities fraud involving medical devices for the early detection of cancer. According to a follow-up interview conducted with the complainant in or around September 2021, the fraud allegedly took place in or around 2016 and 2017 and resulted in alleged losses of approximately

$38,000. Based on that complaint, the FBI's Los Angeles office opened an investigation (the "Fraud Investigation").

<u>August 27, 2021</u>: The FBI's Los Angeles office re-opened Srivastava as a CI on national security related issues, and Srivastava again started working actively as a CI. The FBI Special Agent who re-opened Srivastava as a source was apparently unaware of the August 11, 2021 complaint pertaining to the Fraud Investigation (see more information below from December 3, 2021).

<u>October 4, 2021</u>: After interviewing the complainant in the Fraud Investigation (as referenced above), the FBI's Los Angeles office closed its investigation. FBI records do not reflect any relationship between closing the Fraud Investigation and Srivastava's work as a CI.

<u>December 3, 2021</u>: An FBI Supervisory Special Agent ("SSA") from the FBI's Los Angeles office wrote a Quarterly Supervisory Source Report covering information and actions pertaining to Srivastava from August 2021 through November 2021. Such quarterly reports are routinely filed for FBI CIs. The SSA noted that the Special Agent who re-opened Srivastava as a source on August 27, 2021 had failed to check for and find the Fraud Investigation complaint that had been filed on August 11, 2021. The SSA further noted that the FBI looked into that complaint and determined that it did not pertain to unauthorized illegal activity. In addition, the SSA's report contained the following derogatory information about Srivastava:

- There were "issues of control, reliability, and honesty with" Srivastava, which were "red-flagged concerns with the SSA" and the assigned case agent;
- The FBI and another government agency ("OGA") met and discussed the information about Srivastava, and the OGA "had multiple concerns about the C[I] and suggested that the C[I] may have given false information to disrupt U.S. government agencies like the [OGA] and FBI";
- Srivastava "ha[d] provided good intelligence in the past but also bad intelligence in several incidences"; and
- The OGA "does not consider this C[I] trustworthy and reliable moving forward."

<u>December 8, 2021</u>: A report from the FBI's Los Angeles office that was written on November 17, 2021 and approved on December 8, 2021 indicated that Srivastava was being closed as a CI. The report said that Srivastava was "not" being closed "for cause." It further noted that Srivastava would "eventually" be "re-opened" by a different squad at FBI Los Angeles. The report stated that Srivastava was recommended for re-opening.

December 15, 2021: A report from the FBI's Los Angeles office stated that Srivastava was being re-opened as a CI. It noted that he had previously been a CI for the FBI. The report stated that Srivastava was not the subject of a previous FBI investigation and was not reasonably believed to be the subject or target of a "pending criminal investigation." The report did not contain any of the derogatory information contained in the December 3, 2021 Quarterly Report discussed above.

January 2022 – September 2022: Reports from the FBI's Los Angeles office show that Srivastava was working actively as an FBI CI.

September 28, 2022: As discussed above, on or about this date, the undersigned AUSA and Case Agent spoke with the Handling Agent who provided the information contained in the Letter and verified that the information in the Letter was accurate, including that (a) Srivastava's work as a CI spanned from August 2021 through December 2021, and (b) "there [wa]s no information in Srivastava's CI file, nor anything about his work as a CI, that might call into question Srivastava's credibility."

October 11, 2022: Srivastava testified at trial.

October 21, 2022: The jury returned a guilty verdict against all three defendants on all counts.

November 2022 – December 2023: Post-trial, Srivastava continued to be an active CI for the FBI's Los Angeles office on matters pertaining to national security. In or around November 2022, Srivastava started engaging in financial transactions related to allegations contained in the Article. However, the FBI had no information concerning the fraud allegations discussed in the Article before in or around December 2023.

July 26, 2024: The FBI's Los Angeles office closed Srivastava as a CI "for cause."

### E. Inaccuracies in the Government's Letter

Based on this recently accessed information, the Government recognizes that its Letter to Judge Vazquez contained several inaccuracies.

*First*, the Letter left the impression that Srivastava's CI status was uninterrupted from September 2019 to December 2021, and that he stopped being a CI in December 2021 "for strictly administrative reasons." In fact, Srivastava's first stint as a CI for the FBI's Tampa office ended in August 2020 and then restarted in August 2021 for the FBI's Los Angeles office. Moreover, after being briefly closed as a CI in early December 2021, he was re-opened within approximately one week and continued being a CI until July 2024—which obviously included the period up to and

including the trial. And while it was technically accurate that he was closed as a CI in December 2021 for "strictly administrative reasons," his CI file contained contemporaneous concerns, discussed above, about his trustworthiness and reliability.

*Second*, the Letter did not disclose that, in addition to the FBI, Srivastava also had a relationship with the OGA, and that as of early December 2021, the OGA told the FBI that it did "not consider" him "trustworthy and reliable moving forward."

*Third*, the Letter incorrectly stated that there was "no information in Srivastava's CI file, nor anything about his work as a CI, that might call into question Srivastava's credibility." In fact, the SSA's December 3, 2021 Quarterly Report contained several statements, detailed above, that directly called into question Srivastava's trustworthiness and credibility.

*Fourth*, the Letter did not disclose that the FBI had opened an investigation against Srivastava in August 2021 based on allegations that he committed fraud through his company developing a cancer detection device. This appears to be the same company that Srivastava was operating at or around the time that he was involved with the defendants in this case. While the FBI closed this investigation in October 2021, the prosecution team would have disclosed it to the Court if we had known about it at the time we submitted the Letter.

### F. Conclusion and Requested Relief

The prosecution team can assure the Court that we believed in good faith that the contents of the Letter were accurate when it was filed and up until we began looking further into this issue after receiving the Article. Nonetheless, we are deeply sorry for having submitted any information—even unknowingly—that was incomplete, inaccurate, and failed to disclose potential reliability issues pertaining to one of the Government's trial witnesses. Through this letter, we have attempted to correct these inaccuracies.

In light of the information contained above, the Government respectfully requests that the Court unseal the Letter so that it may be disclosed to the defendants and their counsel forthwith. The Government also asks to unseal this letter so that it too can be disclosed to the defendants and their counsel.

Finally, should any of the defendants choose to pursue a Rule 33 motion based on the disclosures contained in this letter, the Government is willing to stay the pending appeals for a limited remand to permit the District Court to adjudicate such motions.

Respectfully submitted,

JOHN GIORDANO
UNITED STATES ATTORNEY

/s/ Joshua L. Haber
By: Joshua L. Haber
Assistant U.S. Attorney

On September 29, 2022, the Government submitted a letter to the Court *ex parte* and under seal concerning a witness who testified at trial. Pursuant to that letter, the Government sought and received the Court's permission not to disclose to the defense certain sensitive information about the witness. (See D.E. No. 607). On March 17, 2025, the Government submitted the above letter to the Court *ex parte* and under seal providing information that the Government recently learned about this witness and requesting that the Court unseal the September 29, 2022 letter and the March 17, 2025 letter. In light of the foregoing, the Court GRANTS the Government's request to unseal both the September 29, 2022 and March 17, 2025 letters, and accordingly the Government shall serve a copy of both of these letters on defense counsel by no later than March 21, 2025. Additionally, the Clerk of Court shall UNSEAL the September 22, 2022 letter (D.E. 607).

SO ORDERED.

Hon. Esther Salas, U.S.D.J.
Dated: March 19, 2025

# Exhibit A

**U.S. Department of Justice**
*United States Attorney*
*District of New Jersey*

*Jason S. Gould*
*Assistant United States Attorney*

*970 Broad Street, Suite 700*
*Newark, New Jersey 07102*
*Direct Dial: (973) 645-2776*

**Submitted *Ex Parte***

**<u>To Be Filed Under Seal</u>**

September 29, 2022

**<u>By Hand</u>**

Honorable John Michael Vazquez
United States District Judge
Post Office Building & U.S. Courthouse
2 Federal Square
Newark, New Jersey 07101

Re: *United States v. Douglas et al.*, Crim. No. 17-544

Dear Judge Vazquez:

Please accept this *ex parte* letter brief in support of the Government's request under Rule 16 not to disclose to the defense that Gaurav Srivastava, a prospective Government trial witness, has worked with the FBI as a confidential informant on counterterrorism matters unrelated to this case.

At trial, Srivastava will likely testify under Rule 404(b) that in March and April 2016 he was induced by James Adkins and defendant Jerrid Douglas to pay them $250,000 based on the false promise of a €1 billion Standby Letter of Credit. Unrelated to this case, from September 2019 to December 2021, Srivastava was a confidential informant ("CI") for the FBI and provided information concerning national security and counterterrorism matters. Srivastava was paid $7,244.08 by the FBI for his work as a CI: $500 for "services," and the remainder for reimbursement of expenses like food and travel.

Because of its sensitive nature, the Assistant U.S. Attorneys on this case do not know even the general nature of the information provided by Srivastava, let alone specific information he furnished. However, an FBI agent with knowledge of

Srivastava's activities as a CI confirmed that there is no information in Srivastava's CI file, nor anything about his work as a CI, that might call into question Srivastava's credibility. The agent also confirmed that Srivastava stopped working as a CI for strictly administrative reasons. Accordingly, the Government respectfully requests that the Court order that the Government can withhold information about Srivastava's work as a national security and counterterrorism CI from the defense here.

At the outset, Srivastava's role as a CI does not implicate disclosure requirements under *Giglio v. United States*, 405 U.S. 150 (1972). Srivastava is a victim witness in this case and became a CI over three years after the alleged fraud at issue. His work as a CI, and the *de minimis* payment he received ($500 after expenses), simply has nothing to do with this case. It also is not probative of his truthfulness. The FBI confirmed that Srivastava's CI file contains no *Giglio*-type information. If anything, the FBI's apparent trust in Srivastava on sensitive national security matters would serve only to bolster his credibility. Thus, disclosing Srivastava's role as a CI is not subject to production under *Giglio. See* Fed. R. Evid. 608(b) (allowing inquiry into specific instances of conduct, in the discretion of the court, only if "probative of truthfulness or untruthfulness"); *see also United States v. Bocra*, 623 F.2d 281, 288 (3d Cir. 1980) ("the type of inquiry into specific conduct of the witness for impeachment purposes is *quite limited*"); *United States v. Abair*, 746 F.3d 260, 263 (7th Cir. 2014) ("Because the possibilities for abuse are substantial . . . the conduct must be sufficiently relevant to truthfulness before it can be the subject or cross-examination.").

Moreover, courts have long recognized the Government's right, absent special circumstances, to withhold from the defense the identity of government informants. *Roviaro v. United States,* 353 U.S. 53 (1957); *see also McCray v. Illinois,* 386 U.S. 300, 309 (1967) (the privilege "is well established, and its soundness cannot be questioned"). As the Supreme Court explained, this privilege is necessary to protect government informants as well as to promote effective law enforcement:

> Communications of this kind [by informants] ought to receive encouragement. They are discouraged if the informer's identity is disclosed. Whether an informer is motivated by good citizenship, promise of leniency or prospect of pecuniary reward, he will usually condition his cooperation on an assurance of anonymity – to protect himself and his family from harm, to preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution actions against him. The government also has an interest in nondisclosure of the identity of its informers. Law enforcement officers often depend upon professional informers to furnish them with a flow of information about criminal activities. Revelation of the dual role played by such persons ends their usefulness to the government and discourages others from entering into a like relationship.

*McCray*, 386 U.S. at 308-09 (citation omitted).

The issue of an informant's identity typically arises where, unlike here, a person acting as an informant provided information about a pending criminal matter and the government seeks to conceal that informant's identity. In such circumstances, disclosure of an informant's identity is required only when there is an adequate showing that disclosure is "relevant and helpful to the defense" and "essential to a fair determination of a cause." *Roviaro*, 353 U.S. at 60-61. Mere speculation that disclosure would be helpful is not sufficient to override the Government's privilege. *Id.* at 197 ("mere speculation that an eyewitness may have some evidence helpful to the defense's case is not sufficient to show the specific need required by *Roviaro*"); *United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir. 1983) (en banc); *United States v. Brenneman*, 455 F.2d 809, 811 (3d Cir. 1972). In *United States v. Jiles*, 658 F.2d 194, 198-99 (3d Cir. 1981), the Third Circuit concluded that *Rovario* and *McCray* required disclosure of a confidential informant's identity where: "(1) the [confidential informant's] testimony was highly relevant; (2) it might have disclosed an entrapment; (3) it might have thrown doubt upon the defendant's identity; and (4) the informer was the sole participant other than the accused, in the transaction charged." (*citing* McCray, 386 U.S. at 310-11, and *Roviaro*, 353 U.S. at 63-65).

Absent this showing, courts have repeatedly refused to compel the Government to disclose an informant's identity. *See, e.g., United States v. Allen*, 566 F.2d 1193, 1194 (3d Cir. 1977); *United States v. Cantor*, 470 F.2d 890, 892 (3d Cir. 1972); *United States v. Ferrone*, 438 F.2d 381, 386-87 (3d Cir. 1971). If, however, this heavy burden is met, courts then balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *McCray*, 386 U.S. at 62, 77.

Here, the circumstances strongly favor maintaining Srivastava's anonymity as a Government CI. As discussed, his identity as a CI and the details of his assistance to the FBI have no connection to his trial testimony. He is a victim witness from an alleged fraud that took place in 2016, long before he began working as a CI on national security and counterterrorism matters. Thus, pursuant to Rule 16(d)(1), the Government respectfully requests that the Court permit the Government to withhold information pertaining to Srivastava's work as a CI from the defense in this case.

Rule 16(d)(1) also provides that "the court may permit a party to show good cause by a written statement that the court will inspect *ex parte*." According to the Advisory Committee Notes, "[a]n *ex parte* proceeding would seem to be appropriate if any adversary proceeding would defeat the purpose of the protective or modifying order." Fed. R. Crim. P. 16, 1975 Amendment.

Obviously, disclosure of the contents of this letter and the proposed protective order would defeat the purpose of the requested application. Accordingly, the Government respectfully asks that the Court consider this letter and grant the

Government's requested relief *ex parte*. *See United States v. Innamorati*, 996 F.2d 456, 487-88 (1st Cir. 1993) (noting that Rule 16 "expressly authorizes the court to deny discovery of information sought by a defendant based on an *ex parte* showing by the government of the need for confidentiality").[1]

Finally, when the Court considers an *ex parte* submission, Rule 16(d)(1) requires the Court to seal that submission. According to the Advisory Committee Notes, an *ex parte* application under Rule 16 "shall be made to the judge alone if the party so requests." Fed. R. Crim. P. 16, 1975 Amendment. Thus, the Government requests that this letter brief also not be revealed to any of the defendants.

The Government is available to discuss these issues with the Court at its convenience if necessary.

Respectfully submitted,

PHILIP R. SELLINGER
United States Attorney

*s/ Jason S. Gould*
By: Jason S. Gould
Joshua L. Haber
Assistant U.S. Attorneys

It is hereby ordered on this 4th day of ~~September~~ October, 2022, that this letter-brief is sealed until further order of the Court. It is also ORDERED, for the reasons stated on the sealed record of October 4, 2022, that the Government's motion to not disclose is GRANTED.

THE HONORABLE JOHN MICHAEL VAZQUEZ
UNITED STATES DISTRICT JUDGE

[1] The Government will notify each defendant about this application, but obviously not its contents.

# Exhibit B

his copy is for your personal, non commercial use only Distribution and use of this material are governed by our Subscriber Agreement and by copyright law For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https //www wsj com/politics/national security/gaurav srivastava scam e7ca3d26

# A Fake Spy, Russian Oil and $1 Million Funneled to Democrats

Former business partner claims Gaurav Srivastava scammed millions by posing as a CIA operative; a photo op with Biden

*By Joe Wallace* Follow

Aug. 27, 2024 9:00 pm ET

Gaurav Srivastava dreamed of being a player in the murky world of clandestine operations.

His goal was to build a private military and intelligence operation, funded by natural resources, he told business partners. It would be akin to the notorious Wagner Group, only with the blessing of the U.S. instead of Russia. Leaving associates with the impression he had high-level contacts in the intelligence community, he said he wanted to do business in difficult places and muscle bad guys out of strategic markets.

He joined forces with an oil trader, a former senior CIA agent and veterans of the U.S. and Australian special forces. Gen. Wesley Clark, a former NATO commander, served as a paid adviser. Srivastava donated more than $1 million to Democratic causes, scored a photo op with President Biden and met lawmakers from both parties. A star-studded event he hosted with the prestigious Atlantic Council think tank featured the singer John Legend.

Who was this person, a green-card-holding Indian businessman in his early 30s, a college dropout, splashing money around Washington and rubbing shoulders with the president?

His associates say he isn't who he purported to be. A wealthy trader who teamed up with Srivastava to deal in Russian oil accuses him of extortion and pretending to be a CIA secret agent to steal his money. People familiar with the agency's operations, including former intelligence officers, said they weren't aware Srivastava had ever worked for the CIA.

Srivastava siphoned tens of millions of dollars out of the trader's firm, which he plowed into his donation spree and a Los Angeles mansion, according to messages, emails and financial records.

Srivastava's story—part Austin Powers, part James Bond—shows the ease with which someone with money and moxie can access Washington's most influential people.

In recent months, the Biden campaign, Senate Majority PAC and Democratic Congressional Campaign Committee have frozen or returned Srivastava's donations, after journalism startup Project Brazen last fall reported allegations he impersonated a CIA agent. FBI agents in Los Angeles started to investigate Srivastava last year and have examined the source of his money, said people familiar with the matter.

A Switzerland-based attorney for Srivastava, Charles Adams of Orrick, Herrington & Sutcliffe, shared letters saying his client "never participated in any blackmail, fraud, threats, or extortion."

The letters, written to the trader's lawyers, deny Srivastava held himself out to be a clandestine CIA operative. To do so "would have endangered Mr. Srivastava," lawyers at Orrick wrote, whereas "those seeking to harm Mr. Srivastava would have every interest in circulating such allegations."

Adams, a former U.S. ambassador to Finland, later demanded The Wall Street Journal not publish anything from the letters. He described the Journal's questions as "bulls    " without elaborating. "We won't acknowledge your existence," Adams said.



Niels Troost, a veteran trader of Russian oil, shows a photograph of Gaurav Srivastava with President Biden. PHOTO: MARCO SERVENTI FOR THE WALL STREET JOURNAL

## Missions for 'the agency'

On the face of it, Srivastava's pitch wasn't entirely far-fetched. Profiting from the overlap between commodities, intelligence and security is an old line of business, especially in

developing economies and war zones. Srivastava told associates he would compete with Erik Prince, the former chief executive of defense contractor Blackwater, who later went into oil, minerals and logistics. Companies including U.K.-based G4S and Olive Group protect oil fields for energy producers.

Prince didn't respond to requests for comment.

Srivastava was born in Lucknow, northern India, in 1990 into a family with interests in airport security, entertainment and telecoms, according to Indian corporate filings and people who have done business with Srivastava and his relatives. He enrolled at the University of Southern California in 2012 but didn't graduate, said a university spokeswoman.

He appears to have gotten his start in security several years later, after moving to London.

A contact introduced him to Gordon Conroy, an Australian special-forces veteran who incorporated Unity Resources Group in Singapore in 2004, one of the many private-security organizations that prospered in Iraq after the invasion.

Srivastava told Conroy he worked on missions for "the agency" from which he feared he wouldn't return alive, said people familiar with their discussions.

He proposed working together in North Africa. They flew by private jet in 2020 to meet a senior official in the Russia-aligned forces that control eastern Libya. Their aim: To request oil in return for military work, the people said. Nothing came of it, they said.

That summer, a firm called Unity Resources Group was registered in Wyoming at Srivastava's request, according to a corporate filing and people familiar with the incorporation. Whether Srivastava told Conroy he was using the Unity imprimatur couldn't be learned.

## Gen. Clark goes to Sudan

Srivastava met Gen. Clark in early 2022. Clark, who ran NATO's Balkan intervention in the 1990s, started an eponymous consulting firm in Little Rock, Ark., after retiring, and toyed with a presidential bid.

At first, Srivastava spoke about doing business in Africa, and over time he expressed an interest in oil, food security and sanctions, Clark said in an interview. Clark said he "did a lot of due diligence" before agreeing to work with Srivastava as an adviser on international



Gaurav Srivastava with retired Gen. Wesley Clark

affairs. He said Srivastava "hinted at some kind of relationship with the U.S. government" that couldn't be disclosed.

One of Clark's first tasks was to travel to Sudan to arrange gold exports from mines Srivastava claimed to own, the general said. Clark said he met militia leader Mohamed Hamdan Dagalo, a protagonist in the civil war that broke out afterward. Dagalo had offered gold in return for counterterrorism training Srivastava promised to perform, according to Sudanese officials.

The gold never got exported, said Clark and the officials. But Srivastava landed a payday. Dagalo, under the impression Srivastava represented the CIA and eager to develop relations with the U.S., paid him $3 million, according to the officials. They said they weren't aware of Srivastava ever doing security work.

## The oil trader

By the time Russia invaded Ukraine in February 2022, Niels Troost had traded Russian oil for almost three decades from Geneva, amassing a fortune.

The Dutch trader's business soon ran into trouble, as European banks cut off Russia-focused companies. A business associate threatened to destroy him, suggesting he would spread allegations about connections in Russia, according to the trader, memos he wrote at the time and messages.

Troost said in an interview he confided in Ugandan oil executive Habib Kagimu, who introduced him to someone he said could help. He goes by "G," short for ghost, Troost recalled Kagimu saying. "G" had told Kagimu he joined the CIA aged 16 after seeing a roadside recruiting ad, according to an affidavit signed by the Ugandan executive and reviewed by the Journal. Kagimu vouched for "G's" espionage chops, according to Troost and the affidavit.

"G" was Srivastava. Troost says the purported spy returned with scary news: The person threatening him wrote a report for the FBI saying the trader worked with Russia's security services.

Troost says he protested that he didn't deal with Russian state companies. Srivastava said he persuaded the feds Troost was the wrong guy, according to the trader.

Not only that, he had an opportunity, Troost said. Srivastava would get him permission from the U.S. to trade Russian oil as part of a CIA-approved program. It would help Washington keep track of Moscow's most important industry. Srivastava would use Troost's firm to sell commodities he received for security work he claimed to do in Africa, Troost says.

He signed up.



roost poses for a portrait at his office in Geneva. PHOTO: MARCO SERVENTI FOR THE WALL STREET JOURNAL

## Under interrogation

Troost had to undergo interrogation, he says Srivastava told him. At Geneva Airport, he met French financier Nicolas Bravard, according to messages between them and people familiar with the matter. Srivastava described Bravard who once traded bonds at Morgan Stanley and Goldman Sachs Group—as a friend in the FBI, says Troost.

After a grilling by Bravard, the trader zipped to Bali, according to Troost, and photos and videos of the trip. He says Srivastava peppered him for two days, sometimes in the jungle to avoid surveillance. Monkeys scampered over their luxurious villa.

Srivastava's lawyers at Orrick counter that Troost "sought Mr. Srivastava out by interrupting [his] family vacation in Bali," according to a letter from the firm to the trader's lawyers.

Srivastava confided he "was with the CIA," Troost says. He said he wanted to re-create the 17th-century Dutch East India Company, telling the Dutchman its trading outposts had been intelligence bases, according to Troost.

Good news, Troost says Srivastava announced: CIA Director William Burns cleared the program. Srivastava said he had to buy half of Troost's company, Paramount Energy & Commodities, according to a lawsuit Paramount filed in California against BakerHostetler. The law firm, which used to represent both Paramount and Srivastava, didn't respond to requests for comment.




he Troosts and Srivastavas socialize in New York. PHOTO: NIELS TROOST

Celebrating July 4th with his new business partner, Srivastava wore an "Air Force One Presidential Guest" polo-shirt, according to a video.

A few weeks later, Srivastava forwarded a message that appeared to come from someone in government complaining Troost was taking too long to sell. "This is not how to build a friendship," it said. "EB & HS calling now." Srivastava explained the acronyms referred to the executive branch and homeland security, Troost says.

At the end of July, Troost sold half Paramount's shares to the financier, Bravard, who held them for Srivastava, according to Troost, others involved in the transaction and letters later written by Srivastava's lawyers. The price: 50,000 francs or around $58,000. Troost says Srivastava claimed he couldn't own the shares on paper because Russia and other countries wouldn't do business with a U.S. agent.

Srivastava's lawyers at Orrick later wrote to Troost's lawyers that "it was Mr. Troost who wanted Mr. Srivastava to purchase 50% of the company" to expand Paramount through Srivastava's "global connections."

Paramount stopped trading Russian oil from Switzerland over the summer. Its Emirati subsidiary stayed in the market. Troost says he wasn't involved in the Dubai operation and hasn't touched its earnings.

The trader is fighting sanctions imposed by the U.K., which said he "facilitates the unfettered trade of Russian oil."

This guy must be for real, Troost says he thought when Srivastava introduced him to Clark. The general sent Troost's firm ideas never executed to trade commodities such as Libyan oil, according to messages.

Clark said he was passing on proposals from contacts.



he Geneva offices of Paramount Energy & Commodities. PHOTO: MARCO SERVENTI FOR THE WALL STREET JOURNAL

## A conference in Bali

Before the 2022 midterms, Srivastava plowed money into Democratic campaigns including $500,000 to the Senate Majority PAC, according to federal donation data. He funded a food-security conference for the Atlantic Council in Bali. Price tag: About $1 million, said people familiar with the event.

Senate Majority Leader Chuck Schumer appeared in a video about the food crisis.

Seconds later, Srivastava strode on stage with an American flag pinned to his collar, according to a video.

"My work through my company, Unity Resources Group, has taken me to hot spots around the world," he said, adding: "I stand before you today as a proud American devoted to the venerated principles of my country."

What the guests didn't know: Wyoming had dissolved the firm a month before for failure to file its annual report, according to a filing. And he wasn't a U.S. citizen, said a person familiar with the matter.

"A special thank you to Gaurav and your family foundation," said Rep. Pat Ryan by video. Srivastava had donated to the congressman, and told him he had a connection to the CIA, said a person briefed on their interactions.

John Legend performed after embracing Srivastava. Prabowo Subianto, Indonesia's defense minister and now president-elect thanked "Mr. Gaurav" for the event. "I call him Mr. G."



Srivastava with singer John Legend at the Global Food Security Forum in 2022. PHOTO: THE ATLANTIC COUNCIL

## Pacific Palisades villa

Srivastava extracted fresh cash from Troost's company via a conglomerate called Arsari Group, controlled by Subianto's brother.

Srivastava told Troost Indonesia was a key U.S. ally, and Arsari a vehicle for CIA ops, the trader said. He pressed Paramount to lend Arsari $51 million as a biofuels investment, according to Troost, a former Paramount official, a drawdown notice, bank-transfer statements, a business proposal and messages to Arsari from a Srivastava lawyer in Jakarta.

In reality, Srivastava wanted to use some of the money to pay for a villa in swanky Pacific Palisades, according to emails, messages and letters between an Arsari official and another of his lawyers.

But with the clock ticking on the house purchase, trouble struck: Bank officials blocked a $25 million transfer to a Delaware shell corporation controlled by Srivastava, suspicious about its structure, according to the correspondence. The transfer request was then repackaged as a loan repayment, and the bank let the money through.

A spokeswoman for Arsari said it terminated relationships with Srivastava and his L.A. lawyer after "commercial interactions that led us to question their integrity."

Srivastava and his wife beat several celebrities to buy the villa for $24.5 million, according to property records and people involved in or briefed on the deal.

Srivastava's lawyers denied he benefited from Paramount's loan.

More cash arrived another way. Troost and Srivastava set up an American subsidiary of Paramount, which the Swiss parent lent $6 million to get started, according to the trader, others familiar with the transaction and a loan document. In January 2023, Srivastava said he needed most of that to reimburse expenses, according to an email.

"He never showed what the money was being spent on," Troost says.



his villa in Pacific Palisades, Calif., photographed before Srivastava and his wife bought it for $24.5 million, featured a bocce court, an orchard and a wine cave fashioned from a bomb shelter. PHOTO: RYAN LAHIFF

## Unicom Worldwide

Srivastava set up shop in an office in L.A. with views over the beach, said people familiar with the matter. He decorated it with American flags, 9/11 memorabilia and eagle seals, giving the appearance of a governmental building, according to some of the people and a photo.

The office was to be the headquarters of Unicom Worldwide, a combination of Unity's security service and Paramount's traders. Unicom would put boots on the ground, gather intelligence, spread U.S. influence and get paid in commodities. Men from the world Srivastava aspired to inhabit—espionage, covert ops and high-stakes trades—joined the team.

One, retired Army special-operations officer James Reese, had met Srivastava the previous summer when Troost asked him to go to Ukraine to oversee cargoes of grain about to sail through the Black Sea, said people familiar with the matter. Reese first crossed paths with Troost under the Trump administration, when a firm he co-founded got a sanctions waiver to do oil deals with Kurdish allies of the U.S. in Syria.



roost, the oil trader, shows a mock up drawing for the logo of Unicom Worldwide. PHOTO: MARCO SERVENTI FOR THE WALL STREET JOURNAL

Another addition: John Maguire, who made his name flushing out a Russian mole at the top of the CIA before helping run agency operations in Iraq, according to people familiar with his career and an interview he gave to the True Spies podcast in 2022.

In a brief phone interview, Maguire said the Journal had “no idea” what the real story was, and implied that Srivastava was the victim of a Russia-sponsored disinformation campaign.

One project was to provide personal protection to the president of the Democratic Republic of the Congo, a source of materials for electric vehicles, according to a business proposal and people familiar with the venture. Srivastava didn’t show up to a meeting he arranged in Brussels with the DRC president, leaving Clark to ad-lib about Unity’s capabilities, some of the people said.

The DRC’s U.S. embassy didn’t respond to a request for comment.

## The ‘inversion’

By spring, Troost says, he was anxious. There was no paperwork showing Paramount had governmental backing. Srivastava told Troost he had to move the firm so it was based in the U.S., in a maneuver known as an “inversion,” according to the trader, former Paramount staffers and the lawsuit against BakerHostetler.

Creating a U.S. company was a plan “conceived of by Mr. Troost not Mr. Srivastava and certainly not as part of any so-called fraud,” Srivastava’s lawyers said.

Messages, emails and recordings of phone calls, though, show Srivastava and his representatives pressing Troost to “invert” as fast as possible. Troost says it made no sense,

and he feared it could give Srivastava control of Paramount's remaining money.

Troost flew to California in March, but says Srivastava wouldn't let him into the office, claiming he didn't have clearance without doing a lie-detector test.

## On Capitol Hill

Donations and lobbyists opened doors. That spring, Srivastava met Mark Warner, Democratic chair of the Senate Select Committee on Intelligence; Sen. Richard Blumenthal's staff; Rep. Ryan and his friend from West Point, Republican Rep. John James, among other lawmakers and officials.

Srivastava wanted James to introduce the Congo president to members of Congress, said people familiar with the meetings. Staffers had a hard time following Srivastava's presentation, some of them said. Warner warned a contact on the Hill to be careful with Srivastava, said people familiar with the call.

Just as Srivastava scored in D.C., trouble was brewing in L.A. The money from Paramount was almost out. In April, Clark got a final payment of $128,000, about half what he said he was owed, according to a company spreadsheet and a letter the general's lawyers wrote to Srivastava. Clark said he stopped working with him in early 2023.

The Atlantic Council pulled out of talks to establish a national-security institute named after Srivastava and returned $500,000, said people familiar with the matter. It couldn't tell if he was telling the truth about himself, they said.

Most problematic, Troost had grown wary of G's story and refused to send more money.

Srivastava tried to convince Troost he was a "nonofficial cover operative," or NOC, one of 30 such top-secret agents working for the U.S., according to recordings. "I never lost a f—ing one guy on a mission, man," he told Troost.



roost says he broke with Srivastava after concluding he had been deceived. PHOTO: MARCO SERVENTI FOR THE WALL STREET JOURNAL

Warren Buffett was once a NOC and now ran the CIA's pension plan, Srivastava claimed, explaining that NOCs all knew each other.

"I've never heard of Mr. Srivastava and I have no connection with the CIA," Buffett told the Journal.

In early May, 2023 Srivastava told Troost CIA Director Burns had yelled at him to do the inversion.

"He's saying what the f are you doing," Srivastava said. "He said I want this done...He said G, stop with the bulls—."

Explain we're ironing out a corporate-governance issue, Troost responded.

"Man you have to understand these people, the rulebook doesn't matter," Srivastava said. "It is in the United States government charter which was written in the Declaration of Independence. It's there. He can do whatever he wants. It's part of our Constitution."

Srivastava's lawyers said he "has no recollection of this conversation and further never had a call with William Burns or the CIA it is a fabrication."

Troost rescinded Srivastava's share purchase on the grounds he had been deceived.

Srivastava and his representatives argued that Troost had deceived him by moving money out of Paramount, which the trader denies.

Reese stopped working with Srivastava soon after Troost, but Maguire stuck with him, said people familiar with the matter.

Troost, the trader, feels burned, but takes solace in believing he wasn't alone. "It wasn't just me," he says. "The entire political system fell for his story."

*— Nicholas Bariyo, Costas Paris, Elisa Cho and Jim Oberman contributed to this article.*

Write to Joe Wallace at joe.wallace@wsj.com